J-S27044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.P.P., II, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.P.P., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 590 MDA 2023 |

Appeal from the Decree Entered February 10, 2023
In the Court of Common Pleas of Fulton County
Orphans' Court Division at No(s): 2023-00001

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.F.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P.P., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 591 MDA 2023 |

Appeal from the Decree Entered February 10, 2023
In the Court of Common Pleas of Fulton County
Orphans' Court Division at No(s): 2023-00002

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P.P., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 592 MDA 2023 |

Appeal from the Decree Entered February 10, 2023
In the Court of Common Pleas of Fulton County
Orphans' Court Division at No(s): 2023-00003

J-S27044-23

MEMORANDUM BY SULLIVAN, J.:              **FILED OCTOBER 11, 2023**

J.P.P., Sr. ("Father"), appeals from the decrees involuntarily terminating his parental rights to his son, J.P.P., II (born in June 2015), and his twin son and daughter, J.F.P. and K.M.P. (born in December 2016) (collectively, "the Children").[1]  We affirm.

The Orphans' Court set forth the factual and procedural history as follows.

> On December 3, 2019, Fulton County Services for Children ("the Agency") received a General Protective Services [("GPS")] referral for Father's youngest son, [J.F.P.].[2]  After investigation, the allegations in the referral were found to be valid, and the Agency determined that the family was in need of services; the family was accepted for services in January 2020.  Starting in approximately November 2020, Father became the sole caregiver for the Children due to Mother's mental health instability.
>
> While in Father's care, the Children resided in a small camper that had no running water or toilet [and was deteriorating].  The camper's only source of heat was an electric

---

[1] By separate decrees on the same date, the Orphans' Court terminated the parental rights of the Children's mother, L.A.P. ("Mother").  Mother did not file appeals or participate in the instant appeals.

[2] This referral alleged "a lack of supervision and intellectual delays of [Mother] that negatively impacted her ability to be an appropriate caregiver for three small children with developmental delays."  Orders of Adjudication and Disposition, 12/7/21, at ¶ 1(c)(1).  The Agency had "five validated referrals since 2016 [concerning the family] includ[ing] allegations specifically for both natural mother and natural father's inadequate nurturing/affection; natural father's inability to cope; both natural mother and natural father's behavioral health concerns; and natural father's use of inappropriate discipline."  **See id**. at ¶ 1(c)(26).

- 2 -

heater and part of the floor was caving in.[3]  Father limited the Children's time outside, keeping them inside the camper for long periods of time.  Father also gave the Children over-the-counter melatonin so that they would sleep between 5:00 p.m. and 7:00 p.m. so that he could have downtime.[4]  Father yelled at the Children frequently and failed to intervene successfully when the Children bit or hit one another.  All three children have cognitive and developmental delays, and none of them had been toilet trained, at the respective ages of six and five years old.  Father was also uncooperative with the Agency by refusing to provide consent to release some of the [C]hildren's information to the Agency or allow Agency staff inside the camper.

After an adjudication of dependency based on the above facts, all three children were placed in the custody of the Agency on December 7, 2021, and all three children have continuously been in the Agency's custody since that time.  Father was ordered to participate in a Family Assessment for Services and Treatment ("FAST") through Alternative Behavior Consultants ("ABC") and follow through with recommendations of the assessment, participate in supervised visits with Community Outreach Prevention Education ("COPE"), participate in a psychiatric evaluation and follow all recommendations resulting from the evaluation, participate in anger management classes, cooperate with the Agency and complete all requested paperwork and consents, and obtain and maintain suitable housing free from health and safety threats towards the Children.

Thereafter, permanency review hearings were held on March 16, 2022 and August 25, 2022.  After both hearings, [the Orphans' Court] entered orders finding that the [C]hildren's placements were appropriate and necessary and continued the concurrent goals of reunification and adoption.  In both sets of

---

[3] "[Father ran] an electric cord from his mother's home to get electricity." N.T., 2/2/23, at 158.  **See also** Orders of Adjudication and Disposition, 12/7/21, at ¶ 1(c)(8), (13).

[4] At the hearing on the termination petition, the Agency expressed concern about Father going to bed at 5:00 p.m. if the Children were in his care.  **See id**. at 169.  Father conceded that he tries to get in bed by 5:00 p.m. because he gets up at 1:30 a.m.  **See id**. at 228.  He further noted that he starts work at 3:30 a.m. and has a one-hour commute.  **See id**. at 229.

[o]rders, Father was found to be in minimal compliance with the permanency plans and to have made minimal progress towards alleviating the circumstances which necessitated the original placement.

Similar to the December 2021 [a]djudication of [d]ependency order, Father was ordered to participate in a psychiatric evaluation including IQ testing so that a complete FAST assessment could be completed, participate in anger management classes as recommended by the FAST Triage, participate in supervised visits with COPE, participate in a psychiatric evaluation and follow all recommendations, cooperate with the Agency and complete all requested paperwork and consents, and obtain and maintain suitable housing free from health and safety threats towards his children.

On January 5, 2023, the Agency filed petitions to terminate parental rights of both parents as to all three children. On February 2, 2023, [the Orphans' Court] conducted both a permanency review hearing and a hearing on the petition to terminate parental rights.

Orphans' Court Opinion, 5/12/23, at 1-4 (internal capitalization corrected) (citations to the record and footnotes omitted).

Counsel represented Father, who was present at the February 2023 hearing on the Agency's petition. A guardian *ad litem* ("GAL") and separate legal counsel represented the Children, who were seven and six years old. At the hearing, the Agency presented the testimony of Dr. Maurice Picciotto ("Picciotto"), an expert in general adult psychiatry, who testified about Father's October 2019 psychiatric evaluation and his diagnoses of borderline intellectual functioning, and recurrent, latent depressive disorder, which may severely hinder Father's ability to raise small children. *See* N.T. 2/2/23, at 24-30, 42-43. Dr. Marie Murphy ("Dr. Murphy"), a psychologist with expertise

in completing parental fitness evaluations, testified Father had an intellectual development disability and his SKILLS assessment through ABC[5] showed that Father was unlikely to be successful in childrearing without supportive services. Dr. Murphy testified that in the six months preceding the hearing, Father had problems with housing, daily functioning, mental health, and also with the ability to recognize the emotional, health, and mental needs of a child, provide "adequate supervision and safety rules, and provid[e] adequate solutions to parental situations." *See id*. at 48-53.

Stephen Rager ("Rager"), a counselor at WellSpan Behavioral Health, testified Father was somewhat resistant to being told how to raise the Children, has cognitive limitations, and his perception of reality was abnormal according to recent testing. Rager testified that he did not provide anger management classes, although Father would benefit from them. *See id*. at 68-77. Beth Bryant ("Bryant"), of the Fulton County Family Partnership COPE program, which supervises parent-child visitation, testified Father spent a significant account of his visitation time talking to COPE staff rather than the Children, hits the Children and frequently yells at them, has threatened to put one of them in a straitjacket, and has not aided in their toilet training. *See id*. at 100-108. Father also threatened to harm social workers if the Children were taken from him, threatened to abscond with the Children, and said he

---

[5] A SKILLS assessment assesses six areas of essential parenting skills. *See* N.T., 2/2/23, at 51.

would find out where the foster parents lived. He resisted direction not to make such threats in the Children's presence and instructed the Children to disobey and fight with their foster parents. *See id*. at 110-15, 119, 132-33.

Stacy Smith ("Smith"), an Agency caseworker, testified that the Children's foster parents are very helpful. Smith testified that Father declined assistance to obtain more stable and suitable housing, is uncooperative, tells her how to do her job, refuses to take parenting advice, has accused her of lying, refused for months to meet with her, does not understand the Children's emotional and therapeutic needs, does not participate in their independent education plans, and has threatened a "blood bath" if his demands are not met. *See id*. at 140-58, 165-70, 181. Emilee Bakner ("Bakner"), Director of ABC and an expert in parenting education, testified Father refused for months to have a psychological evaluation, was very combative, and made threats. *See id*. at 183-84, 191-97. Bakner testified after the evaluation, ABC made a series of recommendations concerning parenting, appropriate housing, anger management, psychiatric care, in-home parenting services, and guided visitation, but Father was "[a]bsolutely not" receptive to services. *Id*. at 198-206. Father testified on his own behalf and blamed the Children's behavior problems on their foster parents. *See id*. at 218.

By separate decrees, the Orphans' Court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Thereafter, on April 20, 2023, following the granting of

J-S27044-23

his petitions to appeal *nunc pro tunc*, Father filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[6]  This Court consolidated Father's appeals *sua sponte*.[7]

On May 12, 2023, the Orphans' Court issued a Rule 1925(a) opinion addressing Father's appeals.

> On appeal, Father raises the following issue for our review:
>
> "Did the [c]ourt err in finding that termination of the parental rights of Father in the subject children was warranted in light of the evidence presented before the [c]ourt, and despite the existing bond between the [C]hildren and [Father]?

Father's Brief at 4.

---

[6] By way of background, Father's prior counsel filed a single notice of appeal from the Children's dependency court docket numbers, as opposed to the Orphans' Court docket numbers.  That appeal was docketed at Superior Court No. 389 MDA 2023.  Declaring counsel *per se* ineffective, this Court directed the lower court to appoint new counsel, and counsel to file three petitions to appeal *nunc pro tunc* from the three orders terminating Father's parental rights at the Orphans' Court docket numbers, and once granted, file three notices of appeal, one appeal from each Orphans' Court docket number.  This Court quashed the appeal filed at 389 MDA 2023 on May 5, 2023.

By order entered April 14, 2023, the Orphans' Court appointed current counsel.  On April 20, 2023, counsel filed three petitions to appeal *nunc pro tunc* from the decrees terminating Father's parental rights at each of the Orphans' Court docket numbers, which the Orphans' Court granted.  As indicated, counsel then filed timely notices of appeal.

[7] The Children's GAL and legal counsel each submitted briefs to this Court adopting the Orphans' Court's termination decision set forth in its Rule 1925(a) opinion.

The court briefly spoke with the Children, who were present only at the start of the hearing.  *See* N.T., 2/2/23, at 4-9.

We review involuntary termination orders for an abuse of discretion, a review our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the Orphans' Court's findings of fact and credibility determinations if they are supported by the record. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion in this context exists only upon "a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The Orphans' Court must initially determine whether the conduct of the parent warrants termination under one of the eleven numerated grounds set forth at section 2511(a). Only if the court determines that the petitioner has established grounds for termination under section 2511(a) does the Court assess the petition under section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both section 2511(a) and (b) by clear and convincing evidence, which

is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 358 (citation omitted).

In the case *sub judice*, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one subsection of section 2511(a), as well as section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we will analyze the court's termination decrees pursuant to section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(2), (b).

- 9 -

The grounds for termination of parental rights under section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; they may include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by In re K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023). Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (internal citation and emphasis omitted). This Court has long recognized that a parent is "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *See In re of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017). At a termination hearing, the Orphans' Court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *See S.C.*, 247 A.3d at 1105.

On appeal, Father asserts the Orphans' Court erred in terminating his parental rights because the evidence does not support the Orphans' Courts' findings that he lacked employment and financial stability, had a history of mental health concerns and negative behaviors, or was unable to supervise and provide adequate care for the Children. *See* Father's Brief at 8-9. He

also asserts the evidence does not support the findings that the Children suffered cognitive and developmental delays leading to negative behaviors he failed to address, the Orphans' Court failed to recognize his efforts to obtain a new home, and no testimony proved the absence of his bond with the Children. *See id*. at 10.

In concluding that the Agency satisfied the statutory grounds to terminate Father's parental rights, including pursuant to section 2511(a)(2), the Orphans' Court found as follows:

> Father's failure to obtain safe, stable housing has caused the [C]hildren to be without essential parental care. According to the testimony of Ms. Smith, the three children were living in a small camper with no running water or toilet. The floor of the camper was caving in. Being confined inside the small camper caused developmental delays in the [C]hildren due to their lack of socialization. Father has consistently failed to remedy these conditions as well, even after being directed by the court to do so. [I]it has been over one year since Father was first ordered to obtain and maintain safe, stable housing. He first stated his plans to move to a trailer on his employer's property in January 2022. Unfortunately, as of the filing of the [p]etitions, Father was still living in the camper.
>
> Further, Father's failure to participate in anger management classes, as directed by the Dependency Court since December 2021, shows a lack of diligent effort towards resuming his parental responsibilities which has caused his children to be without essential parental care. At the time, the [C]hildren were placed in the Agency's care, Father was observed threatening the [C]hildren often and being verbally aggressive towards them. It was recommended as part of the FAST assessment that Father participate in anger management classes. Even after it was explained by [Rager] and [Smith] that the therapy Father was receiving from [Rager] was not the anger management classes that the [c]ourt required, Father still failed to participate in anger management classes, showing again a lack of diligent effort towards resuming parental responsibilities and causing [the

- 11 -

C]hildren to be without essential parental care. Father's refusal to go to anger management classes is unlikely to be remedied as the requirements have been explained many times to Father and he still refuses to attend.

Father also showed that he was unable to appropriately discipline [the C]hildren and is unwilling to learn how to do so. When they were first placed in the care of the Agency, the [C]hildren would often hit and bite each other, and Father would fail to intervene and discipline these behaviors. Throughout over one year of supervised visitations, Father was unable to appropriately discipline or manage [the C]hildren. Father was offered parenting services to learn these skills; however, he refused to complete the prerequisites of stable housing and anger management classes and never received the parenting education services he was ordered to complete. Father's failure to take the steps necessary to receive education in how to care for [the C]hildren has caused [the C]hildren to be without essential parental care. Father has failed to make take these prerequisite steps for over a year, showing he is unlikely to learn the necessary parenting skills which he needs.

Therefore, Father's repeated refusal to address his housing needs and his anger issues and improve his parenting skills has caused the [C]hildren to be without necessary parental care, and these conditions will not be remedied. Termination was proper under section 2511(a)(2).

Orphans' Court Opinion, 5/12/23, at 20-22 (internal punctuation corrected) (citations to record omitted).

Upon review, the record supports grounds for termination under section 2511(a)(2). The evidence showed Father's ongoing issues related to parenting, anger management, and proper housing. The court repeatedly ordered services related to these goals, **see** Orders of Adjudication and Disposition, 12/7/21, at ¶ 26; **see also** Permanency Review Orders, 8/25/22 & 3/17/22, at ¶ 32(a); **see also** N.T., 2/2/23, at 55-56, 196-99, but Father failed to comply. Dr. Murphy and Bakner each testified that they would not

recommend the Children be returned to Father until he obtained stable housing, anger management services, and in-home parenting services. *See* N.T., 2/2/23, at 60, 202-03.

At the time of the termination hearing, Father had not yet obtained stable housing and continued to live in a "small camper that continues to deteriorate [with] no running water [or] toilet facilities." Orders of Adjudication and Disposition, 12/7/21, at ¶ 1(c)(8); *see also* N.T., 2/2/23, at 155. Father had continued to live in the camper for more than one year despite the Agency's offer of financial assistance. *See* N.T., 2/2/23, at 150. Father was not cooperative in affording the Agency additional access to the camper. *See id*., at 155. Smith testified that "[Father] has refused to schedule home visits with me or to meet with me."[8] *Id*. Beginning in January 2022, Father advised that he would be moving to a trailer on his employer's property. However, while initially scheduled to be ready by October 2022, at the time of the subject hearing, it was not projected to be ready until May or June 2023. *See id*. at 150, 214-15, 225-26.

Father also failed to engage in required anger management services. *See id*. at 166. Rager treated Father for moderate recurrent major

---

[8] Smith further testified, "[W]hen I have offered to meet with [Father,] it's either I have to schedule with his mom because it's her property[,] or I'm not allowed on the property[,] or he is in bed at 5:00 because he has to go to work." N.T., 2/2/23, at 155.

depression, anxiety, and anger, but did not provide anger management classes although they worked on emotional regulation in response to stress. *Id*. at 70, 78.[9] While recognizing the obstacles of finance, transportation, and motivation,[10] Rager stated Father would benefit from complying with the recommendation for anger management classes.[11] *Id*. at 70-71, 79-80. Smith's testimony established that Father's willingness to engage in anger management treatment was belated and perceived by him to be unnecessary:

> Q. With regards to anger management, did you have discussions with [Father] regarding anger management?
>
> A. Yes, before he received TPR papers he told me he was receiving anger management through Steven Rager, and then when I explained to him that we received the paperwork that stat[ed] it was not anger management classes, he told me I was a liar.
>
> Q. Have you worked with [Father] at all to provide recommendations for anger management classes?
>
> A. The day he received his TPR paperwork he called me and was willing do anger management if needed, but he still stated that he was already receiving it.

_____

[9] Father had additionally been diagnosed with borderline intellectual functioning. *See* N.T., 2/2/23, at 56-57.

[10] Rager explained that Father "can be a little obstinate at times toward authority figures instructing him what to do, especially related to his children." N.T., 2/2/23, at 70.

[11] Rager acknowledged that medication management would be "helpful" for Father. *See* N.T., 2/2/23, at 77. He testified that Father had been seeing a nurse practitioner but was discharged in February 2022 for lack of attendance and/or noncompliance. *See id*. at 74-75, 81-82. Father indicated that his family doctor now prescribes medications for depression and anxiety. *See id*. at 222-23.

*Id*. at 151; *see also id*. at 219-20.  Smith further indicated that she then supplied Father with the names of providers.  *See id*. at 151, 171-72.

Similarly, at the time of the hearing Father had yet to engage in in-home parenting services and was resistant to the idea that he required them.[12] Smith testified that Father rejected in-home services and "told me he didn't need parenting and his parenting was right and nobody was going to tell him how to parent."  *Id*. at 165.  Father demonstrated no willingness to engage in parenting classes until after the termination petition was filed and, even then, imposed constraints.  Smith testified as follows:

> Q. Has he at any time indicated any willingness to engage in parenting education services?
>
> A. Not until after the TPR papers were delivered to him, and then he told me that he wouldn't work with ABC, though, for parenting education, and everybody would have to work around his schedule and provide the gas money for him to get there.

*Id*. at 165-66.  Likewise, Dr. Murphy indicated that Father was not receptive to further services.  She stated that Father "had on numerous occasions expressed that no one was going to tell him how to parent."  *Id*. at 59.  Father expressed this same type of opposition to Bakner.  *See id*. at 201.

Given Father's resistance, Smith testified there were no further services the Agency could offer.  She stated, "[W]e have exhausted all the services

---

[12] Father had previously been referred for parenting services in 2017 and 2018.  *See* N.T., 2/2/23, at 157, 172.

- 15 -

that we could offer and they are always met with [Father's] resistance or demands and lack of follow through." *Id*. at 170.

Based on the foregoing, we discern no abuse of discretion by the court in concluding the evidence warranted termination pursuant to section 2511(a)(2). The record substantiates the conclusion that Father's repeated and continued incapacity and refusal to address his unresolved parenting and anger management issues and unwillingness to improve his housing situation, despite the offer of financial assistance, caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. *See In re M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). Father cannot or will not remedy this situation. *See id*. Father's resistance and continued lack of insight belies any suggestion of future progress. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).[13]

Having affirmed the Orphans' Court's finding of sufficient grounds for termination pursuant to section 2511(a)(2), we next must determine whether

---

[13] The court's misstatement that Father had not obtained employment, though incorrect, is immaterial in light of all of Father's failures to correct deficiencies in his housing, parenting, and anger management that deprived the Children of the essential parental care, control, and subsistence they required.

- 16 -

termination was proper under section 2511(b). Regarding the section 2511(b) needs and welfare analysis, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the [O]rphan's [C]ourt must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship. . . .
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotations, brackets, and indentation omitted). In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *T.S.M.*, 71 A.3d at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. As explained in *K.T.*,

> a court conducting a [s]ection 2511(b) analysis *must consider more than proof of an adverse or detrimental impact* from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the

- 17 -

bond serves the child's developmental, physical, and emotional needs and welfare.

296 A.3d at 1113 (emphasis added).

Father argues that the Agency failed to present any evidence that "terminating [Father's] parental rights would not negatively harm the bond between he and his children, which, as referenced *supra*, [Father] stated was 'strong,' and to which absolutely no counter testimony was offered." Father's Brief at 14-15.

In concluding termination of Father's parental rights best serves the Children's developmental, physical, and emotional needs and welfare pursuant to section 2511(b), the Orphans' Court stated:

> Looking first toward Father's bond with his children, both Father and [Bryant] testified that he loves his children. The [C]hildren's feelings toward [Father] are harder to discern. [Bryant] testified that [J.P.P., II] has become more aggressive with [Father] recently. [J.F.P.] tries to hit Father when Father tells him no. [K.M.P.] has recently been rebelling against Father. However, Bryant also testified that the [C]hildren are generally excited to see Father at the visits.
>
> Turning now to[] the welfare of the [C]hildren, through their legal counsel, the [C]hildren have expressed a desire to stay in their foster care placements and not return home. Further, the [C]hildren have made significant developmental progress in their placements, attending school and receiving necessary medical and mental health services. Both [K.M.P.] and [J.P.P., II], are in the life skills classroom, and [J.F.P.] is in the multi-disability classroom. All three children have IEPs, and Father has not participated in the preparation of any of them. The [C]hildren's placements also tend to their medical and mental health needs as well. Both [J.P.P., II] and [J.F.P.] need medication therapy for their ADHD and outpatient therapy. We have no reason to believe Father would continue these therapies if the [C]hildren were returned to him.

Father has shown that he is either incapable or unwilling to address [the C]hildren's needs through his continued refusal to obtain stable housing, parent them appropriately, or participate in the court-ordered services that will grow his parenting skills and meet [the C]hildren's needs. The [C]hildren need permanency and stability, which is provided to them through their current placements, which are permanency resources. We have no assurances that Father will attend to the [C]hildren's specialized educational and emotional needs. Accordingly, the record, supports terminating Father's parental rights would be in the best interest of the Children.

Orphans' Court Opinion, 5/12/23, at 26-27 (internal punctuation corrected) (citations to record omitted).

Upon review, we discern no abuse of discretion. The record supports the court's finding that the Children's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to section 2511(b). **See T.S.M.**, 71 A.3d at 267.

Father participated in a total of 34 of 47 visits, attending 11 of 12 visits since August 2022. **See** N.T., 2/2/23, at 100. However, his visitation with the Children remained supervised and never progressed to unsupervised interactions with the Children. **See** Orders of Adjudication and Disposition, 12/7/21, at ¶ 26(a); **see also** Permanency Review Orders, 8/25/22 & 3/17/22, at ¶ 32(a). Additionally, in August 2022, visitation was reduced from two-hour weekly visits to one and one-half hours bi-weekly visits due to concerns regarding the length of visits, the Children being ready to leave early, and Father's inability to control their behavior. Father's lack of interaction and negative behaviors also concerned Agency workers. **See**

Permanency Review Orders, 8/25/22, at ¶¶ 4(b), 7(b), 32(a); *see also* N.T., 2/2/23, at 101, 176.

Bryant, who was involved in supervising Father's visitation through COPE, observed that the Children were excited and "seem happy to be in a visit" when visiting with Father. N.T., 2/2/23, at 118-20. However, she testified that Father spent a lot of time during visitation talking to staff. *Id*. at 101. Further, Bryant described that the Children's behavior during visitation had become more "verbal" and "aggressive." *Id*. at 102-03, 117-18. She explained,

> [J.P.P., II] has -- I would say his behavior has gotten worse over the past few months. During the visits, he is very verbal, very aggressive, swears a lot, calls names.
>
> [J.F.P.] tends to try to hit [Father], if there is any -- if he tells him no or anything. His first reaction is to hit him, and I would say [K.M.P.]'s behavior, she's become a lot more verbal as well.
>
> If [Father] asks her to do something, even if it's just come give daddy a hug, there is lot of noes. She kind of rebels against it.

*Id*. at 102. Bryant continued, "They're out of control, and [Father] will even say that their behaviors are a lot worse and that they are -- they are hard to control." *Id*. at 104. She testified that Father used "yelling," corporal punishment, and "verbal commands and threats" to discipline the Children. *Id*. at 103-04. Bryant stated,

> I absolutely think that [Father] loves his children. I think that, you know, the way that -- this is my opinion. I don't have any, you know, documentation to say otherwise. It's just the way he presents himself to them may become -- may appear to be more aggressive than, you know, than what we would -- we would advocate for, you know, as far in the parenting, the way that he

disciplines, you know, grabbing them by their arms and smacking them. That's like -- that's not one of the things that we would recommend.

*Id*. at 119. As a result, Bryant indicated that COPE has had to intervene in Father's visitation with the Children "numerous times." *Id*. at 107, 114. She further raised concerns that Father made threatening and aggressive statements in front of the Children. *See id*. at 110-12, 114.

Moreover, the Children all have special educational and therapeutic needs. As Smith indicated, all three have individualized education programs, and are receiving therapy and/or medication and/or in the process of doing so.[14] *See id*. at 140-47. Smith stated Father does not understand and cannot meet such needs. *See id*. at 168, 170. She testified:

[Father] just refuses to follow through with services that are needed for the kids because he is too busy telling people that they have to follow his schedule or he will come when they need him to come or he doesn't understand the importance of the consistency that [the Children] need, that they need that weekly therapy or that med management appointment and not just because it doesn't work around his schedule. They have to go to the appointments. They all three have delays.

---

[14] At the time of adjudication, the Children "all had significant cognitive and developmental delays; including speech delays, and not being potty trained." Orders of Adjudication and Disposition, 12/7/21, at ¶ 1(c); *see also* N.T., 2/2/23, at 181-82. J.F.P. was diagnosed with autism in October 2022. At the time of the hearing, Smith testified that he was in the process of being assigned an intensive behavioral health specialist and had an appointment scheduled with regard to medication for ADHD. *See* N.T., 2/2/23, at 144.

*Id*. at 169.  Smith reported that the Children were doing well medically and educationally and receiving the necessary treatment and services with their placements.  *See id*. at 140-47.

Bryant testified that the Children, who had been placed for approximately fourteen months[15] indicated that they do not want to return home.  She stated, "[T]he last six months they have -- they have really started to say we are not coming home.  We are not coming to live with [Father] . . .."  *Id*. at 116.  As a result, Bryant opined that it is in the best interests of the Children to terminate Father's parental rights.  *Id*. at 170.

We conclude the record supports the Orphans' Court's determination termination of Father's parental rights best serves the Children's developmental, physical, and emotional needs and welfare pursuant to section 2511(b), despite evidence that the Children had affection for him.  As such, we do not disturb the Orphans' Court's determination.[16]

---

[15] Subsequent to the March 2022 permanency review hearing, J.F.P. was placed in a separate foster home from his siblings, where he remained.  *See* Permanency Review Order (J.F.P.), 8/25/22, at ¶ 4(d).

[16] Father waived his challenge to the Orphans' Court's reliance on expert opinions, *see* Father's Brief at 14-15, by failing to assert that claim in his concise statement of errors complained of on appeal and statement of questions involved.  *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (citations omitted) (explaining, in part, this Court will not review an appellant's claim unless it is included in both the concise statement of errors complained of on appeal and statement of questions involved).

Because Father failed to show the Orphans' Court abused its discretion in finding grounds for termination pursuant to section 2511(a)(2) and termination of Father's parental rights favors the Children's needs and welfare pursuant to section 2511(b), he is due no relief. For the foregoing reasons, we affirm the termination decrees.[17]

Decrees affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/11/2023

---

[17] To the extent that Father argues that the findings of fact in the subject decrees were adopted from the termination petitions, **see** Father's Brief at 7-8, this claim does not entitle Father to relief. In the instant matter, as discussed above, there is ample evidence in the record to support the decrees and we do not disturb them.